**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Entitled Action Pending in U.S.D.C. Northern District of Illinois**
**Case No.: 1:22-cv-03189**

| | |
|---|---|
| **In re: Motion to Compel Compliance with Subpoena Directed to Department of Labor** | Misc. Case No. 1-25-mc-00173-ACR |
| ANTHONY DALE, BRETT JACKSON, JOHNNA FOX, BENJAMIN BORROWMAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERY on behalf of themselves and all others similarly situated,<br>*Plaintiffs*,<br>v.<br>DEUTSCHE TELEKOM AG et al.,<br>*Defendants.* | Honorable Ana C. Reyes |

**T-MOBILE US, INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL THE UNITED STATES DEPARTMENT OF LABOR TO PRODUCE DOCUMENTS PURSUANT TO FED. R. CIV. P. 45**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................1

II. ARGUMENT ............................................................................................................ 3

A. The Requested Documents and Data Are Highly Relevant to the Underlying Action. ....................................................................................... 3

B. DOL's Prior Productions are Insufficient. ......................................................... 5

C. CIPSEA Does Not Bar Production of the Requested Materials. ........................... 9

D. DOL Has Failed to Establish Undue Burden. .................................................... 12

E. The Alternatives Proposed by DOL Are Inadequate .......................................... 14

III. CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Barnes v. Dist. of Columbia*,
289 F.R.D. 1 (D.D.C. 2012) .......... 5, 15

*Dale v. Deutsche Telekom AG*,
No. 1:22-CV-03189, 2023 WL 7220054 (N.D. Ill. Nov. 2, 2023) .......... 4

*In re Denture Cream Prods. Liab. Litig.*,
292 F.R.D. 120 (D.D.C. 2013) .......... 4, 5, 14

*F.T.C. v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977) .......... 13

*Forest Conservation Council v. U.S. Dep't of Lab.*,
2003 WL 21687927 (D.N.M. May 6, 2003) .......... 12

*Lamaute v. Power*,
339 F.R.D. 29 (D.D.C. 2021) .......... 15

*Papst Licensing GmbH & Co. KG v. Apple, Inc.*,
2017 WL 1233047 (N.D. Ill. Apr. 4, 2017) .......... 12, 13

*United States v. Capitol Supply, Inc.*,
27 F. Supp. 3d 91 (D.D.C. 2014) .......... 13

## Statutes

44 U.S.C. § 3561(7) .......... 10

44 U.S.C. § 3572(c)(1) .......... 9, 12

## I. INTRODUCTION

T-Mobile is being sued on the grounds that its merger with Sprint (the "Merger") enabled its rivals, AT&T and Verizon, to charge higher prices for retail mobile wireless telephone services ("RMWTS"). In that underlying lawsuit, Plaintiffs relied on the consumer price index for wireless services ("Wireless CPI") published by the Department of Labor ("DOL") to assert their claims. As a result, T-Mobile sought two basic categories of information from DOL: (1) documents concerning the methodologies used by the DOL to construct the Wireless CPI and related producer price index for wireless services ("Wireless PPI," together with Wireless CPI, the "Relevant Indexes") and (2) the data underlying those indexes. On the first, DOL cannot dispute relevance and does not argue burden. It merely claims that T-Mobile should be happy with what DOL provided or has offered despite that information not being sufficient to respond to T-Mobile's subpoena. On the second, DOL also cannot dispute relevance. DOL instead creates a strawman—claiming that it is statutorily barred from producing the data, despite T-Mobile repeatedly offering to alleviate DOL's statutory concerns. The only burden DOL identifies is in response to a problem of its own creation.

DOL's Opposition only underscores the need for the documents and data that T-Mobile seeks through its Motion. Plaintiffs in the underlying action specifically relied on an observed price jump in Bureau of Labor Statistics' ("BLS") Wireless CPI in July 2020 to argue that the Merger caused the quality-adjusted prices of RMWTS to suddenly increase, reflecting a substantial reduction in competition. Based in part on the July 2020 price jump, the court in the underlying action denied T-Mobile's motion to dismiss. As BLS acknowledges, however, that jump may simply reflect limitations of its index construction methodology rather than an actual change in prices. Dkt. 14-1 ¶¶ 41-43. Moreover, according to BLS, Plaintiffs are apparently using the

Wireless CPI in a "flawed" and "unsubstantiated" manner and drawing unjustified inferences from it. Dkt. 14 ("Opp.") at 12. That is precisely why the discovery at issue in T-Mobile's Motion is so relevant. While T-Mobile agrees with BLS that the Wireless CPI cannot bear the weight that Plaintiffs place on it, Plaintiffs disagree. T-Mobile therefore requires the documents and data it requested from DOL so that it can understand, test and verify all of the ways in which the Wireless CPI is unreliable (including in ways beyond what BLS is willing to admit) and convince the finder of fact with admissible evidence that Plaintiffs' use of the Wireless CPI is improper.

None of DOL's arguments warrant denying T-Mobile's request for this highly relevant evidence that is exclusively in DOL's possession. First, contrary to DOL's assertion, it has not provided most of the responsive information T-Mobile seeks. Instead, it directed T-Mobile to generalized, high-level information on its website. Where it subsequently offered to produce documents, those documents would cover only a portion of the relevant time period and exclude certain key categories of information, including anonymized underlying data and internal documents showing how BLS actually applied its methodology to compute the different prices (e.g., quality-adjusted prices, imputed prices and the reported average prices) used to construct the relevant indexes.

Second, CIPSEA does not bar the production of the data T-Mobile requested. As T-Mobile repeatedly explained to DOL, it is not seeking any information in an identifiable form, which is all that CIPSEA prohibits disclosing. T-Mobile invited DOL on multiple occasions to work together to find a way to anonymize or otherwise protect respondent identifying information ("RII"). While DOL professes concern that T-Mobile will somehow figure out anonymized information, there are over a hundred different mobile carriers in the U.S., offering thousands of different mobile plans at any given time. Each month, BLS collects information on approximately 1,500 plans, many

with the same base plan price and similar features that are indistinguishable without identifying information. If there were concerns about T-Mobile's straightforward proposal—redact or remove identifying data fields—DOL should have come to the table to negotiate a solution, not refuse to engage.

None of the alternatives DOL suggests in lieu of producing the data and documents T-Mobile requested suffices. DOL suggests that T-Mobile use other BLS models, data purchased from a vendor, or an affidavit. But T-Mobile needs the data and methodology that DOL used to construct the Wireless CPI, not substitute data, because Plaintiffs are relying on the Wireless CPI to prove their case. And an affidavit is no substitute for admissible evidence that allows T-Mobile to explore all of the shortcomings of DOL's data and methodology.

T-Mobile has made a diligent and sustained effort to reach compromise with DOL concerning production of the data and documents necessary to resolve the Wireless CPI issue. DOL has delayed at each turn, seeking repeated extensions and refusing to provide assurances that they will make a timely production if ordered to do so by the Court. The Court should grant T-Mobile's Motion and order DOL to produce the data and documents responsive to T-Mobile's subpoena promptly.

## II. ARGUMENT

### A. The Requested Documents and Data Are Highly Relevant to the Underlying Action.

The relevance of the documents and data T-Mobile seeks is beyond dispute. The Wireless CPI is a centerpiece of Plaintiffs' theory of harm. Plaintiffs expressly rely on the Wireless CPI in contending that the Merger caused "quality adjusted" prices of mobile services to sharply increase in July 2020. Dkt. 1 ("Mot.") at 1. And the court in the underlying action found the Wireless CPI relevant to its evaluation of Plaintiffs' theory, noting the Wireless CPI ostensibly showed a spike

in prices in July 2020 after the Merger closed in April 2020. *Dale v. Deutsche Telekom AG*, No. 1:22-CV-03189, 2023 WL 7220054, at *11 (N.D. Ill. Nov. 2, 2023).

"[A] request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 124 (D.D.C. 2013). Here, "there is more than a mere possibility that the information sought may be relevant to the claim or defense of any party," *id.*, as Plaintiffs in the underlying action expressly relied on the Wireless CPI in their complaint and to oppose T-Mobile's motion to dismiss. Dkt. 1-1, Declaration of Minae Yu ("Yu Declaration"), Ex. S at ¶¶ 79–80. In response to T-Mobile's subpoena and during the numerous meet and confers that followed, DOL did not once contest the relevance of the information and documents sought. DOL now belatedly argues that the information and data at issue in T-Mobile's motion is not relevant because Plaintiffs' reliance on the Wireless CPI is misplaced. Opp. at 12.

DOL's opinion on whether Plaintiffs are right or wrong does not govern the discoverability of the information. While T-Mobile agrees that Plaintiffs' interpretation of the Wireless CPI is incorrect and that their reliance on the index is misguided, T-Mobile needs evidence to prove its point. And DOL's opposition confirms that the requested discovery will resolve T-Mobile's and Plaintiffs' competing interpretation of the Wireless CPI: as the sworn affidavit of BLS's Associate Commissioner for Prices and Living Conditions for the Bureau of Labor Statistics confirms, the July 2020 price jump may be an artifact of BLS's methodology and sample composition, not an actual price increase. Dkt. 14-1 at 27-28; *see also* Opp. at 27–29. In fact, prices may have actually declined shortly after the Merger. Dkt. 14-1 at 27–28. While T-Mobile appreciates DOL's acknowledgement of the limits of the Wireless CPI's data and methodology, T-Mobile's ability to defend itself against Plaintiffs' claims cannot be limited to what DOL is willing to admit in an

affidavit. Instead, T-Mobile is entitled to the underlying data used in constructing the relevant indices and documents sufficient to show the methodology employed, so that it can fully understand the indices and explain with admissible evidence to the jury and the court all of the ways in which the Wireless CPI may be unreliable. *See In re Denture Cream*, 292 F.R.D. at 124 (holding that underlying data employed in a study relied on by the plaintiff is relevant); *Barnes v. Dist. of Columbia*, 289 F.R.D. 1, 19–24 (D.D.C. 2012) (granting motion to compel because "[i]n order for the plaintiffs to understand fully the [final government reports at issue], they need to have all the underlying data and information on how the [entity] prepared the Reports").

The requested documents and data are also necessary to depose DOL witnesses. Without the requested production, T-Mobile cannot effectively depose DOL witnesses about the causes of the July 2020 anomaly and the flaws in BLS's data methodology, including both those that DOL has acknowledged and any yet to be uncovered.

**B. DOL's Prior Productions are Insufficient.**

BLS lists over eleven bullet points that purport to describe the extensive scope of documents and explanations the BLS supposedly provided in response to T-Mobile's FOIA request and subpoena, but that list does not hold nearly as much water as it appears. Opp. at 8. The "documentation" BLS references are largely excerpts of its Handbook on Methods ("HOM") or sections of its website.[1] The "explanations" are BLS' refusals to produce responsive information. This information does not adequately explain the methodologies behind the specific indices at issue here. In the parties' numerous meet and confers, T-Mobile explained in painstaking detail why the generalized, high-level information contained in BLS's HOM is

[1] In response to T-Mobile's FOIA request, BLS produced six documents consisting of checklists and canned responses to FAQs.

insufficient. *Id*. at ¶¶ 4–14. Moreover, some of the information DOL claimed would be available in its HOM was non-existent. And DOL's claim that it does not maintain some of the information requested raised concerns about whether its search had been diligent.

In response to the deficiencies identified by T-Mobile, BLS produced seven additional documents. One was a "crosswalk" document that attempted to provide a narrative response by again directing T-Mobile to BLS' website or HOM in most parts. Two documents were excerpts of the HOM copied into a word document. Four files provided some additional information that T-Mobile had requested but did not cover the full time period specified in T-Mobile's subpoena and did not provide any information concerning the Wireless PPI. Moreover, DOL categorically refused to produce certain documents and information altogether, including the underlying data used to construct the relevant indices and documents sufficient to show how BLS actually applied its methodology in constructing the relevant indices.

DOL's response is improper for multiple reasons. For example, DOL refused to provide the sample size for the relevant indices for the entire relevant time period. DOL initially claimed, incorrectly, that the information was available on the BLS website. After T-Mobile pointed out that the information was not actually there, DOL pivoted to claiming that disclosing sample size would enable a reasonable person to identify the survey respondents. Yu Declaration at ¶ 7. When T-Mobile asked to explain how that possibly could be so (given that DOL initially claimed the information was publicly available), DOL offered to produce a document that showed the sample size for the Wireless CPI for only a portion of the relevant period and refused to produce any information concerning the sample size for the Wireless PPI. *Id.* at ¶ 11. DOL's position is unjustified. The sample size is a basic metric needed to evaluate the propriety of a sampling method. DOL clearly maintains this data and the disclosure of the sample size for the Wireless

CPI for certain months in the exemplar documents that DOL provided has not enabled T-Mobile to deduce the identities of any survey respondent—demonstrating that its CIPSEA concerns are unfounded, *see also infra*.

DOL similarly refuses to produce responsive information concerning the response rate for its surveys, the frequency of items being replaced, and the monthly distribution of pricing outcomes (*i.e.*, percentage of replaced items that used observed prices, quality adjusted prices or imputed prices in constructing the relevant indices). At first, DOL claimed that the information is available on its website (it was not), then claimed that it does not maintain responsive data (it does), then that the production of responsive data would violate CIPSEA (it does not), and then offered to produce responsive information for the Wireless CPI for a portion of the relevant time period but nothing for the Wireless PPI. Yu Declaration at ¶¶ 6–12.

As for information and documents sufficient to show how the BLS actually applied its index construction methodology—including how it determined whether a discontinued item and replacement are comparable substitutes, how the BLS computed quality-adjusted prices or imputed prices for replaced items that are not comparable substitutes, and how each of these prices were factored into computing the average price that is reported in its index—DOL directed T-Mobile to BLS's HOM. But that document only discusses a range of methods and factors that *may* or *may not* be used to compute all of the different indexes published by BLS. Yu Declaration at ¶ 6. It says nothing about what methods or factors *were* or *were not* used in the *actual indexes at issue here*.

In fact, the HOM does not even explain how many of its own terms are applied at all. For example, with respect to evaluating whether a discontinued item and a replacement item are comparable substitutes such that no quality adjustments are needed, the HOM provides "[i]f the

original and replacement items are essentially the same, the [commodity analyst] deems them directly comparable, and the price comparison between the items is used in the index. In this case, it is assumed that no quality difference exists between the versions."[2] This explanation does not provide any insight into how BLS determined whether the discontinued item and its replacement—here, for example, a discontinued phone plan and the phone plan introduced in its stead—are "essentially the same" or "directly comparable" or that "no quality difference exists." Similarly, regarding its quality adjustment computation, the HOM states, "[t]he most explicit method for dealing with a replacement item with a difference in quality is to estimate the value of the differences" and "[s]ources of direct quality adjustment information include observable factors such as size or weight, manufacturers' cost data, and hedonic regression models." Again, this explanation does not provide the actual observable factors that were used to make quality adjustments and how they were reflected in BLS's hedonic regression models.

DOL cannot seriously dispute the importance of the missing information given its acknowledgement that the July 2020 price jump was likely caused by the unusually high number of tracked items that were replaced that month that lacked comparable substitutes, requiring BLS to use quality adjusted or imputed prices that yielded a price increase. Yu Declaration at ¶ 24; Exhibit BB to Yu Declaration. Depending on the propriety of subjective decisions that went into determining comparables and computing quality-adjusted and imputed prices, BLS's reported average price for July 2020 may be entirely flawed. Accordingly, T-Mobile requested that BLS produce documents sufficient to show how the BLS actually applied its methodology—such as internal worksheets, computations documents or codes used to derive the computation—but DOL has refused to produce any responsive documents. *Id.* at ¶ 8.

---

[2] https://www.bls.gov/opub/hom/cpi/calculation.htm.

DOL has also refused to produce other relevant categories of documents, including any internal study conducted to evaluate the soundness of its methodology, documents sufficient to show how BLS dealt with certain outlier observations, and non-identifying data used to construct the relevant indexes. Mot. at 18-19. Contrary to its representations, Opp. at 8-12, DOL demonstrably has not provided most of the data and information T-Mobile requested.

**C. CIPSEA Does Not Bar Production of the Requested Materials.**

DOL has repeatedly used CIPSEA as a reason not to produce responsive information and documents. DOL's position is flawed.

First, most of the information and documents T-Mobile requested is not information gathered from survey respondents at all. Instead, for the large part, T-Mobile is seeking information concerning DOL's processes and methodology, such as documents reflecting BLS's own sampling procedures, quality adjustment methodologies, hedonic specifications, comparability criteria, or internal assessment of its methods and procedures. These are BLS's own work product, not data "acquired" from third parties under a pledge of confidentiality. Accordingly, these documents are not subject to CIPSEA protections. DOL does not and cannot explain why its production of these documents is barred by CIPSEA.

Second, even with respect to the data that DOL collected from survey respondents, T-Mobile has told DOL throughout their negotiations that it does not want data protected by CIPSEA. CIPSEA prohibits a statistical agency from disclosing "data or information acquired by an agency under a pledge of confidentiality for exclusively statistical purposes" only where the data is "disclosed in identifiable form." 44 U.S.C. § 3572(c)(1). CIPSEA defines "identifiable form" as "any representation of information that permits the identity of the respondent to whom the information applies to be reasonably inferred by either direct or indirect means." 44 U.S.C. § 3561(7). In other

words, CIPSEA does not impose a blanket prohibition on disclosure; it prohibits only disclosures that would permit respondent identity to be "reasonably inferred."

T-Mobile has repeatedly made clear that it does not seek respondent-identifying information and offered to work with DOL to identify data fields that may be excluded from production to protect the identities of survey respondents. Yu Declaration at ¶ 12. In response, DOL vaguely claimed that there were thousands of fields that may have information that can be used to deduce the survey respondent's identity (without identifying a single actual field that has RII) and refused to engage in any discussions about measures that can be taken to comply with CIPSEA and still produce documents responsive to T-Mobile's subpoena. *Id.* This is not an efficient approach to discovery. T-Mobile was always open to negotiating the removal or redaction of identifying data fields (as is common in any structured data production); DOL would not even consider it.

DOL asserts that any disclosure sufficient to allow replication would inherently allow re-identification due to market structure and the fact that its data may be combined with other publicly available information. Opp. at 22. To illustrate its point, BLS has provided an exemplary chart with fields that it believes T-Mobile may use to de-anonymize the data. The sample chart only illustrates how infeasible that would be:

| Month | Establishment | Establishment Weight | Quote | Description | Quote Weight | Price |
|---|---|---|---|---|---|---|
| Jan 20 | AAAA | 0.45 | 1 | qqqq | 0.2 | $4 |
| Jan 20 | AAAA | 0.45 | 2 | rrrr | 0.3 | $5 |
| Jan 20 | AAAA | 0.45 | 3 | ssss | 0.5 | $4 |
| Jan 20 | BBBB | 0.3 | 1 | tttt | 0.25 | $5 |
| Jan 20 | BBBB | 0.3 | 2 | uuuu | 0.35 | $6 |
| Jan 20 | BBBB | 0.3 | 3 | vvvv | 0.12 | $3 |
| Jan 20 | BBBB | 0.3 | 4 | wwww | 0.1 | $2 |
| Jan 20 | CCCC | 0.1 | 1 | xxxx | 0.3 | $5 |
| Jan 20 | CCCC | 0.1 | 2 | yyyy | 0.5 | $3 |
| Jan 20 | CCCC | 0.1 | 3 | zzzz | 0.1 | $6 |
| Jan 20 | DDDD | 0.04 | 1 | pppp | 0.33 | $3 |
| Jan 20 | DDDD | 0.04 | 2 | nnnn | 0.39 | $7 |
| Jan 20 | DDDD | 0.04 | 3 | mmmm | 0.15 | $4 |
| Jan 20 | DDDD | 0.04 | 4 | llll | 0.19 | $6 |
| Feb 20 | AAAA | 0.45 | 1 | qqqq | 0.2 | $4.50 |
| Feb 20 | AAAA | 0.45 | 2 | rrrr | 0.3 | $5.60 |
| Feb 20 | AAAA | 0.45 | 3 | ssss | 0.5 | $4.50 |
| Feb 20 | BBBB | 0.3 | 1 | tttt | 0.25 | $5.75 |
| Feb 20 | BBBB | 0.3 | 2 | uuuu | 0.35 | $6.80 |
| Feb 20 | BBBB | 0.3 | 3 | vvvv | 0.12 | $3.55 |
| Feb 20 | BBBB | 0.3 | 4 | wwww | 0.1 | $2.70 |
| Feb 20 | CCCC | 0.1 | 1 | xxxx | 0.3 | $5.25 |
| Feb 20 | CCCC | 0.1 | 2 | yyyy | 0.5 | $3.15 |
| Feb 20 | CCCC | 0.1 | 3 | zzzz | 0.1 | $6.20 |
| Feb 20 | DDDD | 0.04 | 1 | pppp | 0.33 | $3.45 |
| Feb 20 | DDDD | 0.04 | 2 | nnnn | 0.39 | $7.65 |
| Feb 20 | DDDD | 0.04 | 3 | mmmm | 0.15 | $4.49 |
| Feb 20 | DDDD | 0.04 | 4 | llll | 0.19 | $6.50 |

Even with this simplified chart that only contains 14 entries per month, there are multiple plans with the same prices and no discernable differences. For example, there is no way to differentiate the "BBBB" carrier who offered a plan for $5 on January 20 from the "CCCC" carrier who also offered a plan for $5 on January 20. While BLS claims that the "combination of the plan descriptions and their prices over multiple months could allow for the identification of survey respondents," BLS does not explain how this could be done with the anonymized description and indistinguishable prices. Given that BLS tracks over 1,500 plans each month, de-anonymizing the actual data will be even more of an infeasible endeavor. At any rate, T-Mobile has no intention of deanonymizing the data. It agrees to use the data in the anonymized form, without identifying information. Nor is T-Mobile asking DOL to create a novel anonymization software or a new public-use dataset. T-Mobile is asking DOL to produce existing documents and data with targeted

redactions or exclusions of fields that could reveal respondent identity. DOL cannot refuse to identify which specific fields it believes are problematic, refuse to engage with T-Mobile's proposals, and then claim that anonymization is categorically impossible. To the extent DOL believes certain fields cannot be disclosed, that should be addressed in a negotiation about which fields to include in the data extract; it does not justify DOL's wholesale refusal to engage.

It is also worth noting that "much of the CPI Series data may have been obtained from publicly available websites" and is quite stale. Opp. at 14. Moreover, a robust confidentiality order in the underlying action protects sensitive information produced in the case. Accordingly, T-Mobile proposed that DOL seek consent from respondents, which would eliminate any CIPSEA concern. *See* 44 U.S.C. § 3572(c)(1); *Forest Conservation Council v. U.S. Dep't of Lab.*, 2003 WL 21687927, at *3 (D.N.M. May 6, 2003) (noting that disclosure of data in identifiable form is permissible with "informed consent of the entity providing the data."). DOL has not explained why it cannot pursue this option.

**D. DOL Has Failed to Establish Undue Burden.**

"[T]he law does not seek to absolve nonparties from any burden, nor could it." *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, 2017 WL 1233047, at *4 (N.D. Ill. Apr. 4, 2017). Instead, nonparties resisting discovery on grounds of burden must establish that the burden is *undue*. That is a case-specific inquiry requiring the weighing of several factors, including relevance, the parties' need for the discovery sought, and the burden on the nonparty. *Id.* at *3. DOL has not carried this burden.

Many of T-Mobile's requests seek documents reflecting BLS's methodology for constructing the Wireless CPI, including sample sizes, response rates, confidence intervals, hedonic specifications and parameters, comparability and compatibility criteria, substitution

decisions, and internal analyses. These materials are maintained by BLS in the ordinary course of business and should be readily identifiable, easy to collect, and easy to produce. DOL has not articulated any burden associated with producing these documents. Instead, it simply asserts, without support, that all requested information is protected by CIPSEA. But information that is *not* produced by third parties and instead is generated by BLS itself cannot fall within the scope of CIPSEA. *See supra*, Section C.

DOL devotes substantial portions of its opposition to explaining the difficulty of anonymizing establishment-level microdata—describing sophisticated techniques such as generalization, data masking, perturbation, and differential privacy. These arguments are largely irrelevant to most of the documents sought by T-Mobile's subpoena. Moreover, T-Mobile has not insisted on a complete "establishment-level micro data set" that would entail a "multi-year dedicated IT project." Opp. at 23; Dkt. 14-1 at ¶ 28. T-Mobile offered to work with DOL to identify specific data fields that implicate RII so that DOL can use its existing data and exclude potentially identifying fields, but DOL declined to engage. DOL cannot manufacture a purported burden and use that as a reason to deny access to its data altogether.

DOL also argues that BLS is operating with reduced staff and faces competing priorities related to monthly PFEI reporting. Opp. at 24. The existence of constraints does not excuse DOL from complying with lawful discovery obligations. "Effort of some sort is an inherent part of life." *Papst Licensing*, 2017 WL 1233047, at *4 (denying nonparty's motion to quash despite claims of burden). Courts routinely require parties to produce documents despite competing priorities absent a showing that compliance would "seriously hinder normal operations." *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977); *see also United States v. Capitol Supply, Inc.*, 27 F. Supp. 3d 91, 101 (D.D.C. 2014) (undue burden can only be established with a "substantial showing of

hardship"). Moreover, DOL's staffing concerns relate primarily to the hypothetical anonymization project that T-Mobile has not requested—not to the straightforward production of methodology documents and underlying data with targeted redactions or fields removed. Reduced staffing does not explain why producing methodology records and discrete, non-identifying fields for a defined period would meaningfully compromise CPI or PPI publication, especially where BLS has already compiled sample-size outcomes, unpublished standard-error series, hedonic-model supplements, and other responsive materials.

And even if DOL faces some burden in producing the requested materials, that burden does not outweigh the needs of the case given Plaintiffs' express reliance on the Wireless CPI, and the damages and injunctive relief Plaintiffs seek. T-Mobile is defending against claims seeking over a billion dollars in damages and an order unwinding a merger that was approved by federal and state regulators. The Wireless CPI is central to Plaintiffs' theory of harm. Under these circumstances, any burden DOL faces is not undue. *See Denture Cream*, 292 F.R.D. at 127 ("the needs of the case, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues, all counsel in favor of requiring the [DOL] to produce the requested discovery").

**E. The Alternatives Proposed by DOL Are Inadequate**

While DOL contends that "there are reasonable alternatives to requiring BLS to provide custom anonymization of the underlying data," Opp. at 25, none of the proposals are workable. For instance, DOL suggests that T-Mobile use other BLS models such as BLS's alternative hedonic indexes or purchase data from third party vendors to satisfy T-Mobile's needs. *Id*. DOL misses the point of T-Mobile's request for the underlying data for the Wireless CPI. These alternative indexes and third-party data were not cited in a billion-dollar lawsuit. Here, Plaintiffs

are relying on the Wireless CPI and the sudden price jump observed in July 2020 in *that index*—a jump that is missing from the Wireless PPI and the alternative index. While these other indices published by the BLS are relevant for the purposes of comparing them to the Wireless CPI, they are not substitutes for the data that was used to create the Wireless CPI. The underlying data and documents showing the methodologies the BLS employed to construct the Wireless CPI is necessary to understand where the process could have broken down to create what appears to be a phantom price increase. Similarly, third-party data would not meet T-Mobile's needs to understand, test and verify the limits and flaws of the data that the BLS actually used to construct the Wireless CPI.

DOL has also offered to provide a declaration from BLS in lieu of producing the requested documents and data. This too is inadequate. As T-Mobile has explained, a declaration addressing the complex issues raised by the Wireless CPI would need to describe over a thousand data points collected each month for a period covering seven years. Mot. at 17. More fundamentally, a declaration would not allow T-Mobile to independently verify the reliability of the Wireless CPI. T-Mobile has "the right to check [DOL]'s work and determine whether the [indexes] accurately reflect" the underlying data. *Barnes v. District of Columbia*, 289 F.R.D. 1, 22 (D.D.C. 2012) (granting motion to compel because the requesting party "need[ed] to have all the underlying data and information on how the [entity] prepared the [reports at issue]"); *Lamaute v. Power*, 339 F.R.D. 29, 40-41 (D.D.C. 2021) (ordering a federal agency to produce all information about a given topic because its earlier production "preclude[d] meaningful interpretation of [the] data"). Regardless, DOL's past attempts to provide information through narrative responses have proven insufficient. A declaration summarizing BLS's conclusions is no substitute for the underlying documents and data that would allow T-Mobile and its experts to independently evaluate BLS's

methodology, identify any errors that may have caused the July 2020 anomaly in the Wireless CPI, and fully defend against Plaintiffs' claims.

## III. CONCLUSION

For the foregoing reason, T-Mobile respectfully request that the Court grant T-Mobile's motion and order DOL to produce documents responsive to T-Mobile's subpoena. Given the pace at which DOL has responded to T-Mobile's subpoena, including the multiple extensions it has needed for its briefing, T-Mobile requests that the Court set a date-certain for any DOL production that it orders such that T-Mobile has access to the information and can effectively complete depositions prior to the close of fact discovery in the underlying litigation.

DATED: March 13, 2026

Respectfully submitted,

*/s/ Rachel S. Brass*

Rachel S. Brass (*pro hac vice*)
Caeli A. Higney (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Phone: 415-393-8200
RBrass@gibsondunn.com
CHigney@gibsondunn.com

Minae Yu (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: 213-229-7000
Myu@gibsondunn.com

Clifford C. Histed ARDC No. 6226815
Michael E. Martinez ARDC No. 6275452
K&L GATES LLP
70 West Madison Street Suite 3300
Chicago, IL 60602-4207
Phone: (312) 807-4448
clifford.histed@klgates.com
michael.martinez@klgates.com

*Counsel for Defendant T-Mobile US, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I electronically filed a copy of the foregoing through the court's CM/ECF system, which will send notifications of the filing to all counsel of record.

*/s/ Rachel S. Brass*
Rachel S. Brass